No. 21-56395

# United States Court of Appeals

*for the*

# Ninth Circuit

---

MAO-MSO Recovery II, LLC,
MSP Recovery Claims, Series LLC, and
MSPA Claims 1, LLC
*Plaintiffs — Appellants*,
v.
Mercury General Corp.
*Defendant — Appellee.*

---

**On Appeal from the United States
District Court for the Central District of California
Case No. 17-cv-02525-AB
Case No. 17-cv-02557-AB**

---

**APPELLANTS' OPENING BRIEF**

---

Andrés Rivero
Alan H. Rolnick
**Rivero Mestre LLP**
2525 Ponce de León Boulevard
Suite 1000
Miami, Florida 33134
(305) 445-2500

Martha A. Geer
Mark Silvey
**Milberg Coleman Bryson
Phillips Grossman PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
(919) 600-5000

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................iv

DISCLOSURE STATEMENT ................................................................................1

STATEMENT REGARDING ORAL ARGUMENT .............................................2

INTRODUCTION ...................................................................................................3

JURISDICTIONAL STATEMENT ........................................................................4

STATUTORY AUTHORITIES ..............................................................................5

STATEMENT OF THE ISSUES .............................................................................5

STATEMENT OF THE CASE ................................................................................6

I.      STATUTORY AND REGULATORY BACKGROUND .........................6

        A.      The Medicare Advantage Program ..................................................6

        B.      The Medicare Secondary Payer Act .................................................8

                1.      *Congress Required Primary Plans to Reimburse "Conditional" Medicare Payments When a Primary Plan's Responsibility to Pay is Demonstrated* ...........................................................................9

                2.      *Primary Plans Must Reimburse Conditional Payments When Their Responsibility is Demonstrated, Regardless of Fault* ......................11

                3.      *To Enforce the MSP Act, Congress Created a Private Cause of Action for Double Damages Against Primary Plans That Fail to Make Payment For, or Reimburse Secondary Medicare Payments* ...........................................................13

        C.      Section 111—The Congressional Mechanism for Detecting Delinquent Primary Payers ............................................................15

II.    FACTUAL BACKGROUND ..................................................17

    A.    Plaintiffs Initially Alleged Two Examples of MSP Act Violations, Which Were Illustrative of Additional Violations That Discovery Would (and Did) Reveal .......................................18

    B.    Data-Matching Discovery ...................................................20

    C.    Data-Matching Discovery Revealed Numerous Additional and Otherwise Undetectable MSP Act Violations ........................22

    D.    Mercury Insisted on Re-Briefing Class Certification ...................23

    E.    Instead of Deciding Class Certification the Court Ordered Further Briefing on Standing..........................................24

    F.    Plaintiffs Demonstrated Standing while Mercury's "Responsive" Brief Raised New Issues ...................................................26

    G.    The July 30th Hearing and Dismissal Order .................................27

SUMMARY OF THE ARGUMENT ....................................................30

STANDARD OF REVIEW ...........................................................31

ARGUMENT .....................................................................32

I.    THE ORDER ON APPEAL APPLIED THE WRONG LEGAL STANDARD AND PROCEDURE IN DISMISSING THIS ACTION FOR LACK OF STANDING....................................................32

II.    PLAINTIFFS PROPERLY DEMONSTRATED STANDING...............38

    A.    This Court Can Conclude That Injury-in-Fact Exists .................38

        1. The Settlement Action ........................................................39

        2. The No-Fault Action ..........................................................41

    B.    This Court Should Conclude that Mercury Caused the Injuries That a Favorable Ruling Would Redress .......................................45

ii

**C.** **The District Court's Decisions Do Not Support Affirmance on Any Other Basis**................................................................46

   *1.* *The Overwhelming Weight of Authority Demonstrates That Plaintiff MSPRC Has Standing to Assert Rights That Were Assigned to MSPRC's Designated Series LLC*.................................46

   *2.* *Plaintiffs Showed They Have Ownership Rights With Respect To HFHP Injuries*................................................................49

   *3.* *The D.M. Claim Conferred Standing for the Settlement Action*......50

**III.** **THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFFS LEAVE TO FILE AN AMENDED COMPLAINT**................................................................56

**A.** **The District Court's Denial of Leave to Amend Did Not Comport with this Circuit's Liberal Interpretation of Rules 15(a) and (d)**................................................................57

**B.** **There Is No Undue Delay, Because Plaintiffs Actively Sought To Assert Their Right to Amend**................................................................58

**C.** **There is No Prejudice to Mercury from Granting Leave to Amend Where the District Court Dismissed the Actions Without Prejudice**................................................................60

**CONCLUSION**................................................................62

**CERTIFICATE OF SERVICE**................................................................63

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Alabama Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015)........................................................................35

*Anaheim Gardens v. United States*,
    118 Fed. Cl. 669 (2014)................................................................44

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
    465 F.3d 946 (9th Cir. 2006)........................................................57

*Bateman v. U.S. Postal Serv.*,
    231 F.3d 1220 (9th Cir. 2000)......................................................32

*Bio–Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health &
    Welfare Fund*, 656 F.3d 277 (6th Cir. 2011)..................................9

*Bischoff v. Osceola Cty., Fla.*,
    222 F.3d 874 (11th Cir. 2000).......................................................38

*Blue Shield Ass'n v. Sullivan*,
    794 F. Supp. 1166 (D.D.C. 1992)..................................................17

*Cranpark, Inc. v. Rogers Grp., Inc.*,
    821 F.3d 723 (6th Cir. 2016).........................................................49

*DaVita Inc. v. Virginia Mason Mem'l Hosp.*,
    981 F.3d 679 (9th Cir. 2020)......................................9, 11, 19, 21

*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987)...................................................58, 60

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003).......................................................60

*Fanning v. United States*,
    346 F.3d 386 (3d Cir. 2003)..........................................................10

*Foman v. Davis*,
371 U.S. 178 (1962)......................................................................57

*Gill v. Whitford*,
138 S. Ct. 1916 (2018)..................................................................35

*Hadden v. United States*,
661 F.3d 298 (6th Cir. 2011) ........................................................11

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
23 F.3d 412 (D.C. Cir. 1994).........................................................17

*Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*,
832 F.3d 1229 (11th Cir. 2016) ...............................................*passim*

*Honey v. Bayhealth Med. Ctr., Inc.*,
2015 Del. Super. LEXIS 378 (Del. Super. Ct. 2015) .....................................8

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
685 F.3d 353 (3d Cir. 2012) ........................................................14

*Jewel v. Nat'l Sec. Agency*,
673 F.3d 902 (9th Cir. 2011) ........................................................44

*Kirola v. City & Cnty. of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ......................................................46

*Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*,
409 F. App'x 77 (9th Cir. 2010) ....................................................54

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ..................................................44, 57

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................................................................*passim*

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,
994 F.3d 869 (7th Cir. 2021) .......................................................14

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,
    935 F.3d 573 (7th Cir. 2019) .......................................................49

*MAO-MSO Recovery II, LLC v. Mercury Gen.*,
    2017 WL 5086293 (C.D. Cal. 2017) ...........................................55

*Mathis v. Leavitt*,
    554 F.3d 731 (8th Cir. 2009) ......................................................11

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) ......................................................31

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022) ......................................................45

*Morongo Band of Mission Indians v. California State Board of Equalization*,
    858 F.2d 1376 (9th Cir.1988) ...............................................41, 42

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
    918 F.3d 1312 (11th Cir. 2019) ..............................................39, 40

*MSPRC v. QBE Holdings, Inc.*,
    965 F.3d 1210 (11th Cir. 2020) ..................................................50

*MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*,
    974 F.3d 1305 (11th Cir. 2020) ...........................................*passim*

*MSP Recovery LLC v. Allstate Ins. Co.*,
    835 F.3d 1352 (11th Cir. 2016) ..................................................55

*MSP Recovery Claims, Series LLC v. Farmers Ins. Exch.*,
    2018 WL 5086623 (C.D. Cal. 2018) ...........................................48

*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*,
    2019 WL 6770729 (N.D. Ohio 2019) ...........................................47

*MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*,
    2020 WL 1330373 (N.D. Ill. 2020) .............................................47

*MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co*,
    2020 WL 8675835 (W.D.N.Y. 2020)............................................................47

*MSP Recovery Claims, Series LLC v. New York Cent. Mut. Fire Ins. Co.*,
    2019 WL 4222654 (N.D.N.Y. 2019)...........................................................48

*MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*,
    2021 WL 720339 (S.D. Fla. 2021) ..............................................................48

*MSP Recovery Claims, Series LLC v. USAA Gen. Indemn. Co.*,
    2018 WL 5112998 (S.D. Fla. 2018) ............................................................48

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
    983 F.3d 1077 (9th Cir. 2020) ....................................................................42

*Navajo Nation v. U.S. Dep't of the Interior*,
    26 F.4th 794 (9th Cir. 2022) ......................................................................32

*Netro v. Greater Baltimore Med. Ctr., Inc.*,
    891 F.3d 522 (4th Cir. 2018) ...................................................................3, 8

*Norse v. City of Santa Cruz*,
    629 F.3d 966 (9th Cir. 2010) ......................................................................33

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) ............................................................*passim*

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ...............................................................34, 35

*Savage v. Glendale Union High Sch.*,
    343 F.3d 1036 (9th Cir. 2003) ...............................................................35, 36

*Spindex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ....................................................................39

*Stalley v. Catholic Health Initiatives*,
    509 F.3d 517 (8th Cir. 2007) ..................................................................3, 14

vii

*Taransky v. Sec'y of U.S. Dep't of Health & Hum. Servs.*,
760 F.3d 307 (3d Cir. 2014) ...........................................................................11

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)…………………………………...……...……..*passim*

*United States v. Baxter Int'l, Inc.*,
345 F.3d 866 (11th Cir. 2003) ..............................................................15, 19

*United States v. $11,500.00 in U.S. Currency*,
710 F.3d 1006 (9th Cir. 2013) ......................................................................59

*Warth v. Seldin*,
422 U.S. 401 (1975).............................................................................35, 46

**Statutes and Regulations**      **Pages**

28 U.S.C. § 1332 ............................................................................................4

28 U.S.C. § 1331 ............................................................................................4

28 U.S.C. § 1291 ............................................................................................5

42 U.S.C. § 1395w-21 ....................................................................................6

42 U.S.C. § 1395w-23 ....................................................................................6

42 U.S.C. § 1395w-27 ....................................................................................7

42 U.S.C. § 1395w-22 ....................................................................................7

42 U.S.C. § 1395y ..................................................................................*passim*

**Other**      **Pages**

42 C.F.R. § 411.25 ........................................................................................16

42 C.F.R. § 411.21 ........................................................................................10

42 C.F.R. § 411.50 ........................................................................................12

viii

42 C.F.R. § 422.108 ................................................................................14

Thomas L. Greaney, *Medicare Advantage, Accountable Care Organizations, and Traditional Medicare: Synchronization or Collision?*, 15 Yale J. Health Pol'y, L. & Ethics 37 (2015) ........................................................6

H.R. Rep. No. 105-217 (1997) (Conf. Rep.). ..........................................7

Black's Law Dictionary (10th ed. 2014) ...............................................7

59 Fed. Reg. 4285-01 ............................................................................16

E. Kuo, *Developments in Medicare Secondary Payer Law*, 2013 Health Law Handbook 12.5 .......................................................................8

Section 111 NGHP User Guide ...............................................................13

MSP Manual (Rev. 10629, Eff. 04-19-21) .............................................12

CMS Memorandum to Medicare Advantage Organizations and Prescription Drug Sponsors (Dec. 5, 2011) ........................................................15

Fed. R. Civ. P. 17 ..................................................................................49

Fed. R. Civ. P. 15 ............................................................................43, 57

## **DISCLOSURE STATEMENT**

Appellants, pursuant to Federal Rule of Appellate Procedure 26.1, certify that no publicly traded company or corporation owns 10% or more of its stock. Appellants further identify the following parent corporations of appellants:

- The members of MAO-MSO Recovery II, LLC are RD Legal Finance, LLC, a Delaware limited liability company, and MSP Recovery, LLC, a Florida limited liability company;

- The sole member of MSPA Claims 1, LLC is MSP Recovery Services, LLC, a Florida limited liability company; and

- The sole member of MSP Recovery Claims, Series LLC, is VRM MSP Recovery Partners, LLC, a Delaware limited liability company.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted because this appeal raises important issues of first impression in this Circuit involving demonstrating Article III standing when alleging claims under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) on behalf of Medical Advantage Organizations ("MAOs") and downstream entities who have assumed the risk of MAOs. The appeal raises two specific questions that Plaintiffs respectfully request warrants oral argument: (1) the appropriate standard of review and proper procedure for determining Article III standing when raised *sua sponte* by the district court at the class certification stage; and (2) what evidence sufficiently demonstrates Article III standing when asserting a claim as an MAO or downstream entity assignee.

# INTRODUCTION

More than forty years ago, Congress passed the Medicare Secondary Payer Act (the "Act" or "MSP Act") to deal with "ballooning medical entitlement costs," *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018), by transforming Medicare from the entity that always foots the bill, into a safety net for the medical expenses of beneficiaries who also were covered by private plans and insurers such as Mercury General.

Only six years later, Congress recognized that it needed to do more to make this transformation effective and amended the Act to add a private cause of action so persons and private entities could recover secondary payments made by Medicare (and later, by MAOs) that private plans and insurers had failed to reimburse. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 524 (8th Cir. 2007). Congress provided for double damages, so that private litigants would "be motivated to take arms against a recalcitrant insurer[.]" *Id.*

Nonetheless, because of information gaps that (formerly) made it difficult to identify when a private insurer was the primary payer, a lack of technological and financial resources for MAOs and other entities to pursue primary payers, and the novelty and seeming (but illusory) complexity of such cases, Congress' mandate is still a long way from being implemented. Secondary payments still are not being reimbursed by primary payers such as Mercury General. This appeal presents the

Court with an opportunity to provide guidance on how best to proceed procedurally and substantively—guidance that will promote judicial efficiency while advancing Congress' goal in passing the MSP Act.

Through this appeal the Court can facilitate a structured process to reconcile in the fairest, most efficient way, claims for reimbursements that insurers like Mercury owe to MAOs, which will more effectively implement Congress' original intent in passing the MSP Act.

## JURISDICTIONAL STATEMENT

This is a consolidated appeal of two cases from the United States District Court for the Central District of California. The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d), because the matter in controversy exceeds $5,000,000, exclusive of interest and cost, and 28 U.S.C. § 1331, as an action arising under federal law. The district court dismissed the actions without prejudice on August 12, 2021. Subsequently, on November 29, 2021, the district court denied Plaintiffs' motion for reconsideration and motion for leave to file a third amended complaint. Plaintiffs timely filed a notice of appeal on December 28, 2021, pursuant to Federal Rule of Appellate Procedure 3(a)(1). This Court has jurisdiction under 28 U.S.C. § 1291, because this is an appeal from a final order that disposed of all parties' claims.

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## STATEMENT OF THE ISSUES

1.     Whether the order on appeal applied the wrong legal standard and procedure when it decided, based on evidentiary submissions, that Plaintiffs did not have Article III standing but failed to provide Plaintiffs with adequate notice of and a fair opportunity to respond to defendant Mercury's standing arguments and erroneously failed to take Plaintiffs' evidence as true and correct.

2.     Whether the order on appeal erred in concluding that Plaintiffs lacked Article III standing, where Plaintiffs presented evidence that they had suffered monetary injury as a result of Mercury's failure, in violation of the Medicare Payer Act, to reimburse Plaintiffs for payments that should have been made by Mercury.

3.     Whether the district court erred in denying Plaintiffs' motion for leave to amend based on purported delay and prejudice to Mercury, where there was no unreasonable delay and dismissal ultimately could result in greater prejudice to Mercury (and Plaintiffs) than would allowing Plaintiffs to amend their complaint.

## STATEMENT OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Medicare Advantage Program

Medicare enrollees may elect to receive their benefits in one of two ways. First, they may receive their benefits under Medicare Parts A and B. Known as the Medicare "fee for service" option, Parts A and B provide hospital insurance and coverage for medically necessary outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B, government contractors pay for Medicare enrollees' expenses directly on a fee-for-service basis.

Experts came to realize that this payment structure encourages healthcare providers to order more tests and procedures than medically necessary. *See, e.g.*, Thomas L. Greaney, *Medicare Advantage, Accountable Care Organizations, and Traditional Medicare: Synchronization or Collision?*, 15 YALE J. HEALTH POL'Y, L. & ETHICS 37, 38 (2015). To address this issue and enhance quality of care, in 1997, Congress created the "Medicare Advantage" option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), but 25 years later, MAOs' secondary payments still are not being reimbursed. That failure improperly depletes the trust funds that support Medicare Advantage, which are the same trust funds that support Medicare Parts A and B. *See* 42 U.S.C. § 1395w-23(f).

Under the Medicare Advantage option, Medicare enrollees receive their Medicare benefits from a private health insurer—such as Blue Cross Blue Shield, Kaiser Permanente, or United Healthcare—which, as noted above, are known as Medicare Advantage Organizations or "MAOs." Through Medicare Advantage, Congress intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

Medicare Advantage sought to improve the quality of care and safeguard the public fisc by employing a "capitation" payment system, by which a specified amount is paid per person. *Capitation*, BLACK'S LAW DICTIONARY (10th ed. 2014). Under a capitation-based system, the MAO (or a downstream entity that has contracted to assume an MAO's risk of loss) provides Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage.

Each MAO contracts with the Secretary of Health and Human Services (the "Secretary" of "HHS"). 42 U.S.C. § 1395w-27. Under that contract, the MAO, who receives the fixed amount per enrollee, must provide at least the same level of benefits that enrollees would receive under the fee-for-service Medicare Plan A and B option. *See id.* at § 1395w-22. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for-service model.

7

As of 2019, nearly 40% of all Medicare beneficiaries received their benefits under a Medicare Advantage plan.[1] MAOs "do not issue a Medicare 'insurance policy' but, rather, send out a document describing Medicare benefits that enrollees receive," known as an "Evidence of Coverage." E. Kuo, *Developments in Medicare Secondary Payer Law*, 2013 HEALTH LAW HANDBOOK 12.5; *accord Honey v. Bayhealth Med. Ctr., Inc.*, 2015 Del. Super. LEXIS 378, at *16 (Del. Super. Ct. 2015) ("[T]here is no such thing as a [M]edicare Advantage insurance policy. Medicare Advantage is, instead, a *federal* program.") (cleaned up). Because they have no "insurance contracts" with their enrollees, MAOs "do not pay benefits pursuant to a 'policy' but rather under a statutory framework." 2013 Health Law Handbook 12.5.

### B. The Medicare Secondary Payer Act

In 1980, Congress, faced with "ballooning medical entitlement costs," *Netro*, 891 F.3d at 524, passed the Medicare Secondary Payer Act ("the MSP Act"), so that Medicare—and later Medicare Advantage Organizations ("MAOs")—would become "an entitlement of last resort, available only if no private [party] was liable." *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1234 (11th Cir. 2016).

---

[1] https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Beneficiary-Snapshot/Bene_Snapshot (last accessed May 16, 2022).

Previously, Medicare had "'paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained.'" *W. Heritage*, 832 F.3d at 1234 (quoting *Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011)). The MSP Act "inverted that system; it made private insurers covering the same treatment the 'primary' payers and Medicare the 'secondary' payer." *Id.*

"The Medicare Secondary Payer provisions, as the name suggests, designate Medicare as the secondary payer in certain circumstances when both Medicare and a non-Medicare entity have independent duties to pay for a covered person's healthcare costs." *DaVita Inc. v. Virginia Mason Mem'l Hosp.*, 981 F.3d 679, 684 (9th Cir. 2020). "The MSP [Act] itself does not impose a duty to pay on Medicare or on any other entity. Instead, the MSP 'presupposes an existing obligation (whether by statute or contract) to pay for covered items or services.'" *Id.* (quoting *W. Heritage*, 832 F.3d at 1237). "Medicare's duty arises from statutory provisions that govern Medicare. And a non-Medicare entity's duty arises from a separate legal source, such as a tort-insurance policy or a group health plan." *Id.*

### 1. *Congress Required Primary Plans to Reimburse "Conditional" Medicare Payments When a Primary Plan's Responsibility to Pay is "Demonstrated"*

The MSP Act "forbids payment by Medicare when another insurer has paid or is expected to pay." *DaVita*, 981 F.3d at 684 (citing 42 U.S.C. §

1395y(b)(2)(A)). To protect Medicare beneficiaries, "[s]ubparagraph (2)(B) authorizes payments by Medicare in certain circumstances, *but all payments must be conditioned on reimbursement* in the event that the Secretary of Health and Human Services discovers that another insurer should have paid." *Id.* at 685 (emphasis added). Subsection (b)(2)(B) has the effect of converting all "conditional payments" into reimbursable *secondary payments* "whenever Medicare discovers that another insurer has paid or should have paid." *Id.* (citing 42 U.S.C. § 1395y(b)(2)(B)).

Thus, anytime Medicare (or an MAO) "makes a payment that a primary plan was responsible for, the payment is merely conditional." *Fanning v. United States*, 346 F.3d 386, 389 (3d Cir. 2003). This rule applies any time liability is contested at the time of the Medicare payment, or where the MAO paid for a medical expense simply because it "did not know that the other coverage existed." 42 C.F.R. § 411.21. Consequently, when another insurer exists with a primary responsibility to pay the medical expenses of someone who happens to be a Medicare beneficiary, *all Medicare payments* made for medical expenses for which the primary plan was responsible—whether or not made in compliance with subparagraph (b)(2)(B)— are subject to reimbursement by that primary plan.

### 2. *Primary Plans Must Reimburse Conditional Payments When Their Responsibility is Demonstrated, Regardless of Fault*

The MSP Act contains a broad definition of "primary plan" that includes, among other things, "an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." 42 U.S.C. § 1395y(b)(2)(A). By 1986, "the MSP—in its peculiar way—designated Medicare as the secondary payer with respect to nearly all insurers and nearly all categories of Medicare eligibility." *DaVita*, 981 F.3d at 686.

In short, a primary plan is responsible for reimbursing conditional Medicare payments rendered secondary by its primary payer status. This responsibility "may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) or payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). If a primary plan "releases a tortfeasor from claims for medical expenses," the "fact of settlement alone . . . is sufficient to demonstrate the beneficiary's obligation to reimburse Medicare." *Taransky v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 307, 315 (3d Cir. 2014) (citing *Hadden v. United States*, 661 F.3d 298, 302 (6th Cir. 2011); *Mathis v. Leavitt*, 554 F.3d 731, 733 (8th Cir. 2009)).

11

The Centers for Medicare and Medicaid Services ("CMS") recently reiterated this rule in updating its Medicare Secondary Payer Manual ("MSP MANUAL"), stating that settling parties may not avoid their obligation to reimburse Medicare by failing to address past or future medical expenses in their settlement—or even by affirmatively agreeing that none of the settlement funds were intended to cover medical expenses. MSP MANUAL, Ch. 7, § 40.11 (Rev. 10629, Eff. 04-19-21) ("Medicare policy requires recovering payments from liability settlements, judgments, awards, or other payments, whether the settlement arises from a personal injury action or a survivor action, and *without regard to how the settlement agreement may stipulate disbursement of any proceeds*.") (emphasis added).[2]

A primary plan also includes an insurer that issued a policy to a Medicare beneficiary which provides no-fault insurance that pays for accident-related medical expenses. "No-fault insurance means insurance that pays for medical expenses for injuries sustained on the property or premises of the insured, or in the use, occupancy, or operation of an automobile, regardless of who may have been responsible for causing the accident." 42 C.F.R. § 411.50. Where no-fault coverage

---

[2] https://www.cms.gov/files/document/r10629msp.pdf (last visited May 16, 2022) ("Because liability payments are usually based on the injured or deceased individual's medical expenses, liability payments are considered to have been made with respect to medical services related to the injury even when the settlement does not expressly include an amount for medical expenses.").

exists, "Medicare has a statutory direct right of recovery from the no-fault insurance . . . ." MSP Manual, Ch. 2, § 60.1. CMS recently reiterated in the MSP Manual that "Medicare's statutory right is higher than the beneficiary's," and "Medicare's right is superior to that assigned to the State." MSP Manual, Ch. 7, 10.3.

When an insurer receives a claim under a no-fault policy and accepts coverage, that insurer has what is called an "ongoing responsibility for medicals" or ("ORM"), which means the insurer has a "responsibility to pay, on an ongoing basis, for the injured party's (Medicare beneficiary's) medicals associated with the claim. This often applies to no-fault and workers' compensation claims, but may occur in some circumstances with liability insurance (including self-insurance)." Section 111 NGHP User Guide, Ch. III: Policy Guidance, § 6.3.[3]

> ### 3.    To Enforce the MSP Act, Congress Created a Private Cause of Action for Double Damages Against Primary Plans That Fail to Make Payment For, or Reimburse Secondary Medicare Payments

When the primary payer reaches a settlement or accepts coverage under a no-fault policy, conditional payments made by Medicare or a MAO become secondary payments as a matter of law, and the MSP Act requires reimbursement

---

[3] Available at https://www.cms.gov/files/document/mmsea-111-december-13-2021-nghp-user-guide-version-66-chapter-iii-policy-guidance.pdf (last accessed May 16, 2022).

"regardless of whether the secondary payer is the Secretary [of HHS] or an MAO."
*W. Heritage*, 832 F.3d at 1238 (citing 42 U.S.C. § 1395y(b)(2)(B)(ii)). The duty to
reimburse is triggered by a demonstration of responsibility and requires the
primary payer to reimburse Medicare (or the MAO) *on its own initiative within 60
days*, without being dunned, let alone being sued. 42 U.S.C. § 1395y(b)(2)(B)(ii),
1395w-22(a)(4); *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d
1305, 1309 (11th Cir. 2020), *cert. denied,* 141 S. Ct. 2758 (2021).

In 1986, Congress—recognizing that the government needed help recovering
secondary payments from primary payers such as Mercury—enacted a private right
of action for individuals and private entities to sue for reimbursement of
Medicare's (and now MAOs') secondary payments. *Stalley*, 509 F.3d at 524.
Congress provided for double damages so that private litigants would "be
motivated to take arms against a recalcitrant insurer[.]" *Id.*

If a settling tortfeasor or no-fault insurer fails to reimburse the MAO, the
MAO may sue for double damages. *See In re Avandia Mktg., Sales Pracs. & Prod.
Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012) (The MSP Act "unambiguously
provide[s] [MAOs] with a private cause of action"); *accord MAO-MSO Recovery
II, LLC v. State Farm Mut. Auto. Ins. Co.,* 994 F.3d 869, 872 (7th Cir. 2021) ("If an
MAO makes such a conditional payment, the Act in turn creates a private right of
action allowing the MAO to seek reimbursement from the primary payer who

14

should have made payment in the first place."); 42 C.F.R. § 422.108(f) (providing that an MAO "will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations"); CMS Memorandum to Medicare Advantage Organizations and Prescription Drug Sponsors (Dec. 5, 2011) ("2011 CMS Memorandum")[4] (emphasizing that the MSP Act and regulations give MAOs "the right (and responsibility) to collect" from primary payers using the same procedures available to traditional Medicare).

### C. Section 111—The Congressional Mechanism for Detecting Delinquent Primary Payers

When an MAO promptly pays (as federal law requires) for an enrollee's accident-related medical expenses, it frequently has no information as to whether an alternative source of coverage exists. This is so, because an MAO is not a party to any transaction between its enrollee and a first or third-party auto or liability insurer. "Between two sources of coverage, the insurer that pays second is in the superior position to prevent an erroneous or misdirected payment," and "[t]he first payer can avoid such an outcome only by refusing to pay at all," a result that is not what Congress intended. *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003) (Medicare requires an MAO to make prompt payment of all

---

[4] Available at https://www.cms.gov/Medicare/Health-Plans/HealthPlansGenInfo/Downloads/21_MedicareSecondaryPayment.pdf (last accessed May 16, 2022).

covered claims). Thus, when Medicare or an MAO pays, it is paying "in the dark" because "it does not know, and cannot know, whether someone else will pay." *Id*. "By contrast, when the primary insurer later pays, Medicare's prior payment will normally be a matter of ascertainable fact." *Id*.

In an effort to address this issue, Congress enacted Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110–173 ("Section 111"), which amended the MSP Act to aid Medicare in the detection of alternative sources of coverage by requiring primary plan—on their own initiative—to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter *on any basis*"—*i.e.*, including Part C—and "if the claimant is determined to be so entitled," to report the claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C) (emphasis added).

Although Section 111 does not expressly provide for reporting to anyone other than the Secretary, the regulations require primary payers to provide "notice about primary payment responsibility and information about the underlying MSP situation" *to the Medicare payer*. 42 C.F.R. § 411.25; 59 Fed. Reg. 4285-01. The notice must describe "the specific situation and circumstances," including the "particular type of insurance," plus the "time period during which the *insurer is primary to Medicare*." 42 C.F.R. § 411.25(a)-(c) (emphasis added).

16

Accordingly, the MSP Act expressly imposes an affirmative duty on primary payers (like Mercury) to notify MAOs of their primary payer responsibility. *See Blue Shield Ass'n v. Sullivan*, 794 F. Supp. 1166, 1175 (D.D.C. 1992), *aff'd in part, rev'd in part sub nom. Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994). In fact, "[w]hen a liability insurer is obligated to make payment to an injured plaintiff who is age 65 or older, the insurer has reason to know of Medicare's probable interest and to act to ascertain Medicare's involvement." MSP MANUAL, Ch. 7, § 40.13; *ACE*, 974 F.3d at 1319 ("Defendants' settlement agreements with beneficiaries show, at minimum, that Defendants had constructive knowledge that they owed the primary payments.").

## II.   **FACTUAL BACKGROUND**

On March 31, 2017, and April 3, 2017, Plaintiffs sued Mercury in two separate, related class actions under the MSP Act to obtain reimbursement for their assignors' and putative class members' secondary payments that Mercury had failed to reimburse. The "No-Fault Action" (Case No. 2:17-cv-2525) alleged liability based on Mercury's duty to pay under a no-fault policy for a Medicare beneficiary's accident-related medical expenses, while the "Settlement Action" (Case No. 2:17-cv-2557) alleged liability based on Mercury's duty to pay for a Medicare beneficiary's accident-related medical expenses as a result of settling a

third-party liability claim—a claim brought against the insurer's auto or property insurance policyholder.

### A. Plaintiffs Initially Alleged Two Examples of MSP Act Violations, Which Were Illustrative of Additional Violations That Discovery Would (and Did) Reveal

Even though MAOs have parity of recovery rights with Medicare, and the secondary payments MAOs make come directly from Medicare Trust Funds, auto insurers have flouted their reimbursement duties to MAOs for more than a decade, which MAOs have been unable to effectively redress. Plaintiffs uncovered this widespread non-compliance through data analytics, which required cross-referencing unreimbursed, accident-related conditional payments in their assignors' claims data with instances where auto insurers reported to CMS under Section 111 that they were responsible, which made them primary payers under the MSP Act as a matter of law. 9-ER-1740–42. While Plaintiffs have no direct access to the Section 111 reporting, Plaintiffs obtain reports from a subscription service that contracts with CMS and provides to subscribers what primary payers report to CMS. 3-ER-431–32.

While this cross-referencing exercise may be successful in identifying a handful of unreimbursed conditional payments, the bulk of those payments remain hidden without discovery. This is so because auto insurers either failed to report all their claims pursuant to Section 111 (which until this year, resulted in no penalty)

18

or withdrew their reports prior to detection by an MAO. The only way to fully identify all secondary payments that auto insurers failed to reimburse is by comparing an MAO's and an auto insurer's claims data. This reconciliation process identifies all instances where "both Medicare [Advantage] and a non-Medicare entity have independent duties to pay for a covered person's healthcare costs." *DaVita*, 981 F.3d at 684.

For these reasons, Plaintiffs' initial complaints in both the No-Fault and Settlement Actions alleged—through the same type of allegations that Medicare itself made in *Baxter*, 345 F.3d at 882—that Plaintiffs had standing based on assignments from MAOs, which had made unreimbursed secondary payments under the MSP Act, and that Mercury failed to reimburse those payments. *See* 5-ER-939, 950–51, 963, 975–77.

Plaintiffs subsequently amended the complaints of right to allege two specific examples of Mercury's MSP Act violations "for purposes of illustration alone, and subject to the collection of additional data through discovery." *See* 5-ER-901, 928 (the "First Amended Complaint" or "FAC"). The district court granted Mercury's first motions to dismiss with leave to amend to "specifically allege[] the identities of the assignors, whether the assignments were valid, or whether the assignments were received before the complaint was filed." 5-ER-884. Plaintiffs complied with that order by filing second amended complaints ("SACs")

that not only alleged examples of Mercury's MSP Act violations, but also alleged every essential term of every assignment of claims to Plaintiffs that existed when the SACs were filed. 5-ER-743; 5-ER-812.

In response to Mercury's second motion to dismiss, the district court ordered Plaintiffs to produce all the assignments alleged in the complaint—which Plaintiffs did—and ordered supplemental briefing on any remaining issues following that production. 4-ER-709. Despite receiving all the assignments and extensive briefing, at no point did Mercury argue that any of the Plaintiffs lacked the right to pursue the claims at issue under the produced assignments.

In the end, the district court sustained the SAC, finding that standing existed and that Plaintiffs had stated a claim under the MSP Act. 4-ER-685. The district court's order recognized that the allegations of the illustrative claims were sufficient to show injury in fact at that stage. *Id.*

## B. Data-Matching Discovery

Because Mercury had exclusive possession of the information necessary to uncovering all its MSP Act violations—which were the product of its uniform and systematic course of conduct and were undetectable without discovery—Plaintiffs served discovery requests for a list of third-party liability claims that Mercury had settled, and a list of first-party claims made under no-fault insurance policies. 4-ER-681–82. Mercury objected. Despite recognizing the reasons and need for this

discovery, the magistrate judge initially denied Plaintiffs' motion to compel as unripe. 4-ER-683–84.

After moving for class certification (D.E. 168-1), Plaintiffs returned to the magistrate judge and argued that this discovery was necessary to identify all of Plaintiffs' damages and was relevant to class certification. 4-ER-671. Plaintiffs explained that they had been assigned, at that time, the recovery rights to non-reimbursed secondary payments made on behalf of more than a million Medicare Advantage beneficiaries. By electronically matching Mercury's claims data with Plaintiffs' assigned claims data, Plaintiffs would be able to identify beneficiaries who "were both eligible for Medicare and insured by Mercury in connection with an accident such that . . . Mercury as a primary insurer was required to provide reimbursement to MAOs." 4-ER-675. In other words, Plaintiffs simply sought the data needed to reconcile all instances where both an MAO assignor "and a non-Medicare entity have independent duties to pay for a covered person's healthcare costs." *DaVita*, 981 F.3d at 684.

The magistrate judge granted Plaintiffs' motion to compel on July 29, 2019, but allowed Mercury to control the matching process, subject to an agreed-upon data-matching protocol. Shortly afterward, and while the class certification motion was briefed and set to be argued, the parties agreed to move to stay the case, complete the data exchange, and explore resolution of the case. On October 1,

2019, the district court vacated all deadlines and stayed the case. 4-ER-668.

Mediation was scheduled for March 3, 2020.

### C. Data-Matching Discovery Revealed Numerous Additional and Otherwise Undetectable MSP Act Violations

Starting at the end of 2019 and continuing into early 2020, the parties conducted data matching. Mercury provided data as to 831,293 no-fault and bodily injury claims where it already had decided to accept or deny coverage, or settle a liability claim. D.E. 335 at 4. Plaintiffs' assignors' data (at the time) included 1.8 million Medicare beneficiaries. 9-ER-1741. The first step in the data-matching process was to identify how many people "matched." In other words, did a person enrolled in a Medicare Advantage Plan also appear to have (1) made a claim under a Mercury third-party, bodily injury policy, or (2) made a claim under a Mercury first-party, no-fault policy. The preliminary results of the data matching identified 1,795 matches. *Id.* Using additional algorithms to remove all records that had no accident-related payments left records of 81 potential instances of unreimbursed secondary payments. 9-ER-1742.

The parties mediated the case on March 3, 2020, and, as reported to the district court, "entered into a non-binding Memorandum of Understanding ('MOU') as to the steps the Parties would take towards continuing negotiations." 4-ER-665. Specifically, to confirm Mercury's MSP Act liability as to the 81 matched records, Plaintiffs and Mercury exchanged additional information. 4-ER-

665, 667. After incorporating Mercury's additional information in their analysis, Plaintiffs provided Mercury with "a list of preliminary claims [Plaintiffs] contend are at issue and that Plaintiffs contend may be used to estimate alleged damages of the putative class." 4-ER-662. Ultimately, the parties were unable to reach a resolution and reported to the Court that they were at an impasse. 4-ER-659.

### D.     Mercury Insisted on Re-Briefing Class Certification

Following the impasse, the parties worked on a new case schedule. The parties disagreed as to whether Plaintiffs' class certification motion required additional briefing. 4-ER-659. Mercury asserted that new briefing was necessary because of "significant evidentiary developments," and that class certification needed to be based on the "current evidentiary record," which included the 81 potential claims identified from data matching. 4-ER-653. Although Plaintiffs asserted that, at most, only limited supplemental briefing was needed, 4-ER-648, the district court agreed with Mercury, ordered Plaintiffs to file a renewed class certification motion, entered a new scheduling order, and set a status conference for December 11, 2020.

At the status conference, Plaintiffs noted that the scheduling order did not include a new deadline for the amendment of pleadings. 4-ER-640. Plaintiffs' counsel explained that there was no intent to amend prior to class certification, but that amendment to incorporate the data-matching results would be "good order."

4-ER-641–42. The district court expressed concern about amending the complaint prior to a decision on class certification and declined to set a deadline for amending the pleadings. 4-ER-642. The court, however, emphasized that it was "not foreclosing the idea" of an amendment and directed Plaintiffs to "revisit" the issue at the hearing on class certification. *Id.*

### E. Instead of Deciding Class Certification the Court Ordered Further Briefing on Standing

Plaintiffs filed a renewed motion for class certification on January 15, 2021. D.E. 322-3. In its opposition to the motion for class certification, Mercury did not contest Plaintiffs' standing, instead arguing only—and erroneously—that Plaintiffs' assignments presented individualized issues that precluded class certification. 4-ER-576–77. To support that argument, Mercury cited only a letter from Humana that purported to raise an issue with respect to one of the assignments alleged in the SAC. *Id.* Mercury further tried to re-argue an issue involving a Freedom Health assignment that the district court had ruled three years earlier "[did] not pertain to this case." 4-ER-696.

While the class certification motion was pending, Plaintiffs moved to compel Mercury to further comply with the magistrate judge's data-matching order, because additional, large MAOs had assigned their claims to Plaintiffs while the case was stayed. Mercury had refused to allow these assignments to be part of the data-matching process on the notion that they were not identified in the SAC

24

(they could not have been, because the SAC was filed before the assignments occurred). Mercury also insisted, as the district court had directed, that any amendment to the SAC "must wait until after class certification is decided." 4-ER-512–13.

On May 7, 2021, the district court held a hearing on the class certification motion and the motion to exclude expert reports. However, instead of hearing argument on the specifics of class certification, the district court focused on whether the "boat load . . . of discovery" was "enough evidence . . . to support standing . . . ." 3-ER-463. The court was concerned about the letter from Humana which, it said, raised the issue of "[w]ho owns these claims that the plaintiffs are pursuing?" 3-ER-463–64. The court also said that assignments from "Freedom, Optimum Healthcare, Americas 1st Choice – America's 1st Choice in South Carolina," which it had found irrelevant in denying the motion to dismiss, 4-ER-696, raised the same purported concern. 3-ER-464. The court's central question was: "[D]o the plaintiffs have the right to sue on behalf of these MAOs[?]" *Id.*

Following the hearing, the district court ordered Plaintiffs to "address whether there is *evidence* showing an injury-in-fact (by way of exemplar(s)) and whether this injury was caused by Defendant's improper refusal to pay." 3-ER-459 (emphasis added). It ordered Plaintiffs to submit a brief and Mercury to respond but gave Plaintiffs no right to a reply. This gave Mercury an opportunity not only

to respond to Plaintiffs' brief, but to make new arguments to which Plaintiffs could not respond. The court's order stated that it would hold a hearing if it thought one was needed. *Id.* Otherwise, the court would simply proceed to class certification. *Id.*

Plaintiffs sought clarification that they could demonstrate standing based on the entire evidentiary record, which included the additional MSP Act violations revealed through court-ordered data matching. The district court denied the motion, stating that it made clear at the May 7, 2021 hearing that it "expects the parties to provide briefing on whether and how Plaintiffs have demonstrated standing in this matter, using specific examples to aid their arguments." 3-ER-456. The court added that it "seeks the same information that other courts in almost identical actions have sought—nothing more, nothing less." 3-ER-457.

### F. Plaintiffs Demonstrated Standing While Mercury's "Responsive" Brief Raised New Issues

As the district court ordered, Plaintiffs submitted a brief on standing and supporting exhibits that provided evidence of nine MSP Act violations—instances where Mercury was the primary payer, Plaintiffs' assignors had made conditional payments for which Mercury was primarily responsible (rendering those payments secondary), and Mercury had not reimbursed Plaintiffs for those secondary payments. Six of the examples applied to the Settlement Action and three of the examples applied to the No-Fault Action.

26

Two of the sample MSP Act violations already had been identified in the SACs. The other seven were unknown when the SACs were filed and were discovered through data matching. In the standing brief, Plaintiffs expressly requested leave to amend to cure any potential standing issue arising from the fact that not all the violations providing standing had been alleged in the SACs. 3-ER-452.

In its response, Mercury wholly ignored the seven MSP Act violations that were not alleged in the SACs and failed even to attempt to rebut Plaintiffs' evidence that these additional MSP Act violations supported standing. Instead, Mercury made standing arguments it could have made (but didn't make) when moving to dismiss the SACs, including attacking the assignments (3-ER-418–20), as well as several merits-based attacks that did not address Article III standing at all. 3-ER-423–27 (arguing that Plaintiffs "have not produced evidence to support MSP Act liability"). Lastly, Mercury argued that the district court should deny Plaintiffs leave to amend. 3-ER-427–28.

### G.    The July 30th Hearing and Dismissal Order

Under the district court's scheduling order, the next procedural step following Mercury's standing brief was the hearing on Plaintiffs' motion for class certification and the motions to exclude expert testimony, which the court moved from July 16 to July 30, 2021. D.E. 398. The court did not schedule a hearing on

the issue of plaintiffs' standing. At the July 30 hearing, however, the district court stated that it had additional questions following the standing briefing.

The district court asked for Plaintiffs' "position with respect to the notion that these assignments don't include any of the named plaintiffs," 3-ER-386, and to explain why "MAO Recovery, MSPA Claims, and MSP Recovery Claims" are the named plaintiffs but the ultimate assignees are "Series 1509, Series 1608, Series 1705 then MAO Recovery II and then series PMPI." 3-ER-402–03. Plaintiffs cited a recent decision from the Eleventh Circuit that squarely addressed the court's concern (which Mercury's brief had omitted) and upheld Plaintiffs' right to sue. 3-ER-397–404.

Less than two weeks later, on August 12, 2021, the district court issued the order on appeal, dismissing the two actions without prejudice for lack of standing, on the notion that Plaintiffs did not possess recovery rights to the two MSP non-reimbursement violations alleged in the SACs. 1-ER-15. The court declined to address the remaining seven examples that demonstrated standing, because they were not, according to the court, "tied" to allegations in the complaint. 1-ER-23. The order on appeal also adopted arguments that Mercury had raised for the first time in its standing brief, which were not discussed at either the May or July hearings. Without affording Plaintiffs a right to respond on any of these points, the order on appeal incorrectly accused Plaintiffs of "misrepresent[ing] their

assignment rights to the Court at least as it relates to Trinity and [Health First Administrative Plans] based on Plaintiffs' own evidence . . . ." 1-ER-25.

Having had no chance to respond to Mercury's arguments that ultimately led to dismissal and the district court's dismissal order, Plaintiffs filed a motion for reconsideration. In that motion, Plaintiffs addressed by brief and supporting evidence the new arguments advanced by Mercury that the district court had adopted without seeking a response from Plaintiffs. Plaintiffs also sought leave to amend the SACs under Rules 15(a) and (d) to include allegations that would cure the purported standing deficiencies.

The district court denied the motion to reconsider on the theory that Plaintiffs could have raised the arguments in earlier briefing, even though Plaintiffs were not given a right to respond to Mercury's brief. 1-ER-6. The district court also denied the motion for leave to amend, on the basis that Plaintiffs had unduly delayed filing the motion, despite having requested leave to amend at the December 2020 hearing and in their standing brief. 1-ER-13–14. The district court also found that amendment would unduly prejudice Mercury "since it would essentially have to restart the entire litigation," despite the district court having dismissed the case without prejudice. 1-ER-14.

Plaintiffs timely filed their notice of appeal on December 28, 2021. 6-ER-991.

## SUMMARY OF THE ARGUMENT

When the district court concluded, after reviewing evidentiary materials during class certification briefing, that it needed to revisit Article III standing, it erred in ignoring the procedure of Rule 56 of the Federal Rules of Civil Procedure. At that point, Mercury, which asserted that Article III standing was lacking, should have moved for summary judgment, attaching any evidentiary materials supporting its position. Plaintiffs would then have had notice of all the grounds that the district court would address and an opportunity to respond to each issue. Under the controlling standard of *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), the district court would then have been obligated to take Plaintiffs' evidence as true.

The district court further erred by limiting its standing review only to the examples of injury alleged in the SACs, which had been filed prior to the discovery that identified numerous further examples of unlawful non-reimbursement. The court confused the *Lujan* requirement that injuries must exist at the time of filing, *see* 504 U.S. at 571 n.4, with a non-existent requirement that injuries be specifically alleged in the complaint.

Further, the court overlooked this Court's requirement that district courts should allow Rule 15(d) supplemental amendments to cure standing defects. *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1046 (9th Cir. 2015). Plaintiffs submitted evidence and authority compelling the conclusion that the

30

post-filing examples uncovered through court-ordered discovery would cure any perceived standing defects.

Lastly, the district court erred in both failing to allow supplementation of the complaint under Rule 15(d), and failing to allow Plaintiffs to amend, on the notion that it would cause undue delay and prejudice to Mercury. Because the court did not—and could not—find that amendment was futile, and any delay was primarily the result of the chaotic process below, the primary issue was prejudice.

The court concluded that Mercury would be prejudiced because amendment would require Mercury to restart the entire litigation. In making this finding, the district court overlooked the fact that its dismissal without prejudice would allow Plaintiffs to refile using the amended complaint that the court refused to allow Plaintiffs to file below. Consequently, it is the district court's denial of the motion to amend that would require restarting the litigation from the beginning. Allowing amendment of the complaint to resolve any standing issues would allow the parties to pick up where they, and the litigation, left off.

## **STANDARD OF REVIEW**

Standing is a question of law that the Court reviews *de novo*. *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010).

This Court "review[s] a district court's denial of a motion to amend a complaint for abuse of discretion. . . . [D]ismissal without leave to amend is

improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Navajo Nation v. U.S. Dep't of the Interior*, 26 F.4th 794, 805 (9th Cir. 2022) (cleaned up). Additionally, "[a] district court abuses its discretion . . . if it rests its decision on a clearly erroneous finding of material fact." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223 (9th Cir. 2000).

## ARGUMENT

## I.    THE ORDER ON APPEAL APPLIED THE WRONG LEGAL STANDARD AND PROCEDURE IN DISMISSING THIS ACTION FOR LACK OF STANDING

As a threshold matter, the order on appeal applied the wrong legal standard and procedure, after the district court revisited *sua sponte* the question whether Plaintiffs had met their burden of establishing they have Article III standing. Although the district court acknowledged the Supreme Court's decision in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), it then misapplied it.

In *Lujan*, 504 U.S. at 561, the Supreme Court explained that because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation[:]"

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment

32

> motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, Fed. Rule Civ. Proc. 56(e), *which for purposes of the summary judgment motion will be taken to be true.* And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial."

*Id.* (cleaned up) (emphasis added).

Here, the district court already had considered and denied Mercury's motion to dismiss the SACs for lack of standing. When, during class certification briefing, some of Mercury's evidentiary arguments raised questions about standing, the court appropriately raised the issue *sua sponte* and directed the parties to address it. Given the stage of the litigation—after a motion to dismiss had been denied and substantial discovery completed—the correct procedure for the court to address its standing concerns was a summary judgment motion, as *Lujan* anticipated.

Rule 56(f) gives the non-movant the right to "notice and a reasonable time to respond." This Court has held that "[r]easonable notice implies adequate time to develop the facts on which the litigant will depend to *oppose* summary judgment." *Norse v. City of Santa Cruz,* 629 F.3d 966, 971-72 (9th Cir. 2010) (en banc). Thus, the district court should have directed Mercury to file a motion addressing the factual standing issues the court had identified as a result of the class certification briefing. The burden would then have been on Plaintiffs to present evidence *responding* to Mercury's presentation—evidence that, under *Lujan*, the court would have been required to take as true. If the district court had proceeded under

33

Rule 56, it would have been able to decide whether sufficient evidence of standing existed based on a complete factual record grounded in discovery combined with full briefing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (deciding standing on a full trial record).

The order on appeal ignored the fact that it was granting summary judgment, on its own motion, without giving Plaintiffs their opportunity to respond, and taking their evidence as true, as Rule 56 requires. The district court identified issues regarding standing that it wanted addressed and then ordered a briefing schedule in which Plaintiffs would go first and "address whether there is *evidence* showing an injury-in-fact (by way of exemplar(s)) and whether this injury was caused by Defendant's improper refusal to pay." 3-ER-459 (emphasis added). Mercury would then "file its position on standing and respond to Plaintiffs' briefing." *Id.* Plaintiffs would get no reply, and the court would only hold a hearing on standing "if it deem[ed] it necessary." *Id.*

The district court's briefing schedule not only failed to ensure that Plaintiffs received notice of what standing issues Mercury might argue and an opportunity to respond, but the court also denied Plaintiffs' request for clarification of the briefing order and simply directed Plaintiffs to provide the same information other courts expect to receive. 3-ER-457. Then, after specifically directing Plaintiffs to present evidence to support standing, the court (without further notice) refused to consider

34

any of the evidence that was not already alleged in the complaint—even though the court had denied Plaintiffs' motion to amend the SACs to add information obtained in discovery. It then dismissed the SACs based on Mercury's brand-new arguments. Plaintiffs know of no authority authorizing this process.

Indeed, the district court's approach disregarded the Supreme Court's repeated emphasis that, when standing is at issue, a case may be dismissed only when, after review of "*all materials of record,*" standing does not exist. *Warth v. Seldin*, 422 U.S. 401, 501-502 (1975) (emphasis added); *see Gill v. Whitford*, 138 S. Ct. 1916, 1933-34 (2018) (Plaintiffs should have "opportunity to prove concrete and particularized injuries using evidence . . . ."); *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 270-71 (2015) ("[E]lementary principles of procedural fairness required that the District Court . . . give the [plaintiff] an opportunity to provide evidence of member residence."). All materials of record most certainly were not reviewed before the order on appeal issued.

The district court attempted to justify its procedure by citing this Court's decision in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The order on appeal states that "to the extent the Court treats Defendant's filings as a factual attack (or a 'speaking motion'), in which subject matter jurisdiction is challenged as a matter of fact and is based on evidence outside of the pleadings, the Court is not required to presume the truth of the plaintiff's factual allegations.

35

*Safe Air*, 373 F.3d at 1039." 1-ER-20. This was error. After three years of litigation and extensive discovery, the proper procedure would have been to call for a summary judgment motion, on which the district court would have had to consider Plaintiffs' data-matching evidence, and take it as true under *Lujan*, 504 U.S. at 561. Instead, the court refused to consider the data-matching evidence on its *sua sponte* analysis of standing, as if this case were at the pleading stage three years ago (when the district court sustained the complaint and held that standing existed).

In sharp contrast to what should have been a summary judgment motion after years of litigation and discovery, *Safe Air* involved a Rule 12(b)(1) motion decided only 49 days after the initial complaint was filed. This Court stated that in that context it was not necessary to "presume the truthfulness of the plaintiff's allegations," because "'[o]nce *the moving party* has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.'" 373 F.3d at 1039 (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003)) (emphasis added).

The order on appeal misconstrued the reason why the *Safe Air* court did not take the plaintiff's allegations as true. On a Rule 12(b)(1) motion, that plaintiff faced a factual challenge to jurisdiction, which required rebutting defendant's

evidence with evidence, which it did not meet. It could not simply rest on its pleadings. The only similarity is that here, Plaintiffs also had a right to put on rebuttal evidence (which the district court foreclosed by denying plaintiffs a reply), and which they were eager to do. Further, if Rule 56 had been followed here, *Lujan* would have required Plaintiffs' evidence to be taken as true. *See* 504 U.S. at 561. Consequently, the order on appeal misapplied both *Lujan* and *Safe Air*. As both decisions confirm, the district court should have (1) required Mercury to file a Rule 56 motion supported by evidence that Mercury claimed showed a lack of standing, (2) allowed Plaintiffs to respond with their own evidence, and (3) after taking Plaintiffs' evidence as true, decided whether standing existed.

The district court also could have cured Plaintiffs' lack of "notice and an opportunity to be heard" by considering Plaintiffs' motion for reconsideration. That motion provided the legal authority and supporting evidence necessary to respond to the new arguments Mercury's standing brief raised, which ultimately were the basis for the district court's dismissal.

The district court's rationale for denying the motion for reconsideration highlighted its error. It declared that Plaintiffs "do not provide any reasoning" for why "their prior briefing . . . failed to address this key issue, despite Defendant raising this issue in its briefing on standing." 1-ER-9. Not to belabor the point, but Plaintiffs' "prior briefing" *preceded* Defendant's briefing and the court denied a

reply. Thus, (and improperly), there was no prior briefing from Plaintiffs that responded to Mercury's arguments because the district court did not allow it.

In the circumstances, and at the very least, this case should be remanded with instructions to brief standing in accordance with Rule 56, with the district court applying the proper standards. Alternatively, this Court can choose to itself apply the Rule 56 standard to the evidence in the record—evidence that, when taken as true, establishes Plaintiffs' standing. *See, e.g.*, *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 882 (11th Cir. 2000) (applying summary judgment standard on appeal and concluding that standing existed).

## II.  PLAINTIFFS PROPERLY DEMONSTRATED STANDING

### A.  This Court Can Conclude That Injury-in-Fact Exists

The primary, if not sole, issue in this case regarding standing is whether Plaintiffs have shown that they suffered an injury-in-fact. As the Supreme Court recently emphasized, "certain harms readily qualify as concrete injuries under Article III," with "[t]he most obvious" being "monetary harms." *TransUnion*, 141 S. Ct. at 2204. Phrased differently, "[i]f a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id*. In this case—where Plaintiffs have alleged and shown that they suffered a monetary injury when Mercury, the primary payer, failed to

reimburse Plaintiffs' assignors for secondary payments that were conditioned on the primary payer's reimbursement—the actual injury requirement is easily met.

The fact that Plaintiffs are assignees of entities that suffered the economic injuries is immaterial. As this Court has held, "the assignee stands in the shoes of the assignor, and, if the assignment is valid, [the assignee] has standing to assert whatever rights the assignor possessed." *Spindex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.,* 770 F.3d 1282, 1291 (9th Cir. 2014); *accord MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1320 (11th Cir. 2019) ("Though MSPA itself did not suffer injury-in-fact, the assignee of a claim has standing to assert the injury in fact suffered by the assignor.") (cleaned up).

### 1.    *The Settlement Action*

As noted above, when an auto insurer settles a third-party liability claim, it automatically becomes a primary plan with a duty to identify and reimburse any conditional payments made by Medicare or MAOs. *W. Heritage*, 832 F.3d at 1238 (citing 42 U.S.C. § 1395y(b)(2)(B)(ii)). In accord with the district court's directive that Plaintiffs present "evidence showing an injury-in-fact (by way of exemplar(s))," 3-ER-459, Plaintiffs submitted evidence of six examples of instances where Plaintiffs' assignors made accident-related payments on behalf of a Medicare beneficiary that Mercury, the primary payer, failed to reimburse. As the

39

Eleventh Circuit has held, this injury is "a type of economic injury, which is the epitome of 'concrete.'" *Tenet*, 918 F.3d at 1318. The six examples are:

| Beneficiary Initials | Medicare Advantage Assignor | Payment Amount[5] |
|---|---|---|
| D.M. | Trinity Physicians, LLC ("Trinity") | $1,851.09 |
| E.H. | Verimed IPA, LLC ("Verimed") | $1,033.00 |
| A.P. | Health First Health Plans, Inc. ("HFHP") | $262.11 |
| A.A. | Emblem Health ("Emblem") | $378.31 |
| A.D | Family Physicians Group ("FPG") | $547.00 |
| H.M. | FPG | $1,165.24 |

Although the SAC included specific allegations regarding the D.M. example of non-reimbursement, the remaining five examples were not discoverable without the data matching that the magistrate judge compelled after the SAC was filed. The SAC alleged that Verimed previously had made an assignment to MSPRC's designated series.[6] However, because of the lack of discovery, the SAC did not include specific allegations regarding the E.H. non-reimbursement example even though the E.H. injury existed at the time the SAC was filed.

The district court, however, refused to consider the Verimed non-reimbursement claims as a basis for standing, writing that "[u]npled allegations

---

[5] *See* 8-ER-1415–49 (providing evidence of conditional payments).
[6] On April 7, 2016, prior to the filing of the original complaint, Verimed assigned its rights to MSP Recovery, LLC. After the case was commenced, MSP Recovery, LLC, assigned its rights to a series LLC of MSPRC, and MSPRC was made the named plaintiff in the SAC as the real party in interest, which the district court authorized. D.E. 107 at 9-10.

cannot circumvent the requirement that standing exist when the lawsuits were filed." 1-ER-23 (citing *Lujan*, 504 U.S. at 571 n.4). This conclusion embodies a fundamental misunderstanding of the law governing standing. The Supreme Court did not hold in *Lujan* that all facts *must be alleged* at the time of filing; rather, it ruled that "federal jurisdiction ordinarily depends on the facts *as they exist* when the complaint is filed." 504 U.S. at 571 n.4 (emphasis added).

Here, the original complaint was filed in 2017. Mercury had settled E.H.'s third-party liability claim on March 24, 2016, 7-ER-1375, triggering its duty to reimburse Verimed, long before the original complaint was filed. Consequently, the injury resulting from Mercury's failure to reimburse Verimed for secondary payments made for E.H. existed when Plaintiffs filed the initial complaint. The fact that neither Verimed nor Plaintiffs were yet aware of that specific injury—due to Mercury's not advising Verimed of Mercury's primary responsibility—is immaterial for standing purposes.

Therefore, the D.M. and E.H. non-payment examples meet any possible requirement that standing exist "at the time of filing," even though this Court has questioned that rule's viability in *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1046 (9th Cir. 2015) (addressing *Morongo Band of Mission Indians v. California State Board of Equalization,* 858 F.2d 1376 (9th Cir.1988)).

However, even if the D.M. and E.H. examples were both insufficient to establish standing,[7] the four other examples of non-reimbursement injury (A.P., A.A., A.D., and H.M.) each can supply standing upon the granting of a motion for leave to file a supplemental pleading under Rule 15(d). This Court, in *Northstar*, held "that the rule as stated in *Morongo* [requiring standing at the time of filing] does not extend to supplemental pleadings filed pursuant to Fed. R. Civ. P. 15(d)." 858 F.2d 1376; *accord N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1084 n.5 (9th Cir. 2020) ("[W]e nevertheless hold expressly that the district court correctly relied on *Northstar Financial Advisors Inc.*, . . ., which allows us to rely on an amended complaint that satisfies the jurisdictional defects, if any, of an original complaint.").

## 2.    *The No-Fault Action*

As noted above, when a Medicare beneficiary submits a claim under a no-fault insurance policy the auto insurer has a duty to identify and reimburse any conditional payments. Plaintiffs demonstrated injury-in-fact through the following three instances where Plaintiffs' assignors made accident-related conditional

---

[7] Because of the existence of the E.H. injury example, this Court need not necessarily address the district court's decision regarding D.M to determine that standing exists. The district court, however, erred in its analysis of the D.M example, as demonstrated below.

payments on behalf of a Medicare beneficiary that Mercury, the responsible no-fault carrier and primary payer, failed to reimburse:

| Beneficiary Initials | Medicare Advantage Assignor | Payment Amount[8] |
|---|---|---|
| J.R. | Preferred Medical Plan, Inc. ("PMPI") | $9,096.06 |
| C.S. | Emblem | $479.00 |
| S.Y. | Verimed | $336.61 |

The SAC contained specific allegations only as to the J.R. claim because Plaintiffs were unable to uncover the C.S. and S.Y. instances of non-reimbursement until the magistrate judge ordered data-matching discovery.

The S.Y. example (like the E.H. example in the settlement action), came under the Verimed assignment, which predated the filing of the No-Fault action. Because S.Y. was injured in an auto accident on July 7, 2015, Mercury's reimbursement duty arose before the initial complaint was filed. 8-ER-1439; 9-ER-1693–95. Thus, the S.Y. example satisfies any possible requirement that an injury conferring standing predate the filing of the complaint. Even if that were not so, the C.S. example also could provide standing through a supplemental pleading under Rule 15(d), which Plaintiffs should have been granted leave to file.

The district court and Mercury, however, focused only on the J.R. example. Although this Court need not reach any issues regarding the J.R. example, given

---

[8] *See* 8-ER-1415–49.

the S.Y. and C.S. examples, dismissal would not have been warranted even if J.R. had been the only example.

With respect to J.R., the assignment from PMPI validly assigned the non-reimbursement claims, but the ultimate assignee was MAO-MSO Recovery II, LLC, Series PMPI, not MAO-MSO Recovery II, LLC, as the complaint incorrectly alleged. Plaintiffs requested leave to amend to correct this "ministerial or technical defect," 3-ER-452, and no basis existed for denying that request. *See Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 n.3 (9th Cir. 2011) (Dismissal in this Circuit is unwarranted "unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."); *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."); *Anaheim Gardens v. United States,* 118 Fed. Cl. 669, 676 (2014) (permitting plaintiff Silverlake, L.P. to amend complaint to correct misnomer by naming 3740 Silverlake Village, L.P., as plaintiff).

The order on appeal also questioned the J.R.-based injury on what it acknowledged was the "non-dispositive" basis that J.R. was enrolled in a "different MAO," called Preferred Care Partners, Inc., stating that there was "no indication that J.R. was covered by PMPI, instead of [PCPI]." 1-ER-22. However, Plaintiffs' standing brief (and accompanying declarations) presented evidence that Mercury

44

and the district court apparently ignored, 7-ER-1110, 1396–99, showing that in 2014, after an auto accident, an ambulance provider for J.R. billed J.R. and listed J.R.'s insurance as "Preferred Medical Pl." *See also* 7-ER-1398. In 2014, PMPI's Part C plan was called "Preferred Medical Plan Choice (HMO)." 3-ER-359–367.

In other words, *the name of J.R.'s insurance on the 2014 ambulance bill submitted to Mercury matches the name of the Part C plan that PMPI offered in 2014*. Mercury never acknowledged this evidence, and the district court, in denying the motion to reconsider, rejected Plaintiffs' argument on the grounds that Plaintiffs "failed to demonstrate that the 2014 ambulance bill . . . could not have been presented prior" to the dismissal order—even though Plaintiffs had done just that, addressing the ambulance bill in their standing brief. 1-ER-11. Plaintiffs' evidence regarding the J.R. injury, which must be taken as true, establishes that the J.R. example is sufficient to establish standing under *Lujan*.

### B. This Court Should Conclude that Mercury Caused the Injuries That a Favorable Ruling Would Redress

The final two requirements for Article III standing are that the injury "was likely caused by the defendant" (sometimes called "traceability") and "the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203. As this Court recently observed, these two "components for standing overlap and are two facets of a single causation requirement." *Mecinas v. Hobbs*, 30 F.4th 890, 899 (9th Cir. 2022) (cleaned up). There can be little doubt that both elements exist

45

here: the non-reimbursement injury is traceable only to Mercury, and Plaintiffs' injury will be redressed through damages paid by Mercury.

To the extent the district court thought Plaintiffs had some additional obligation, to prove—with respect to standing—that their injuries were due to Mercury's "improper refusal to pay," such a requirement improperly conflates the merits with Article III standing. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . ."); *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) ("The district court seems to have improperly conflated [plaintiff's] standing with whether she would prevail on the merits."). Plaintiffs presented ample evidence of all the elements of standing, and this Court can hold that Article III standing exists and reverse the decision below.

### C. The District Court's Decisions Do Not Support Affirmance on Any Other Basis

#### 1. The Overwhelming Weight of Authority Demonstrates That Plaintiff MSPRC Has Standing to Assert Rights That Were Assigned to MSPRC's Designated Series LLC

As an alternative basis for holding that Plaintiffs lacked standing based on the non-reimbursed D.M. secondary payments (which it claimed had been assigned by the wrong entity), and as additional grounds for refusing to consider the Verimed, Emblem and FPG assignor examples (E.H., S.Y., A.A., A.D., H.M. and C.S.), the order on appeal held that Plaintiff MSP Recovery Claims, Series LLC

46

("MSPRC") had no standing to pursue rights that were assigned to MSPRC's designated series LLC. 1-ER-24. Mercury had argued that "[c]ourts have rejected [the notion] that a parent is allowed to prosecute claims on behalf of a series," citing two cases—an argument that went unrebutted because Plaintiffs had no opportunity to respond. 3-ER-422-23.

Uncritically adopting Mercury's faulty argument and citing its two cases, the order on appeal stated that "it seems that courts ultimately reject" the assertion that MSPRC has standing to sue on behalf of its series LLCs. 1-ER-24. Mercury, however, failed to disclose the overwhelming number of decisions to the contrary, all of which were decided before Mercury filed its brief, including a decision by the Eleventh Circuit. *See, e.g.*, *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1319-20 (11th Cir. 2020), *cert. denied,* 141 S. Ct. 2758 (2021); *MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co*, 2020 WL 8675835, at *8 (W.D.N.Y. 2020), *report and recommendation adopted*, 2021 WL 784537 (W.D.N.Y. 2021); *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, 2020 WL 1330373, at *2 (N.D. Ill. 2020); *MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, 2019 WL 6770729, at *9 (N.D. Ohio 2019); *MSP Recovery*

47

*Claims, Series LLC v. Farmers Ins. Exch.*, 2018 WL 5086623 at *13 (C.D. Cal. 2018).[9]

Instead, Mercury cited *MSP Recovery Claims, Series LLC v. USAA Gen. Indemn. Co.*, 2018 WL 5112998, at *12 (S.D. Fla. 2018), and *MSP Recovery Claims, Series LLC v. New York Cent. Mut. Fire Ins. Co*., 2019 WL 4222654, *6 (N.D.N.Y. 2019), neither of which addressed controlling Delaware law. The *New York Central* court relied exclusively on *USAA*. 2019 WL 4222654, *6. The *USAA* judge, however, has since clarified that "[c]ontrary to Defendant's insistence, *USAA General Indemnity Co.* does not stand for the proposition [that] the named Plaintiff here [MSPRC] 'does not have standing to sue pursuant to assignments to other specifically named "Series" entities.'" *MSP Recovery Claims, Series LLC v. United Auto. Ins. Co*., 2021 WL 720339, at *3 n.4 (S.D. Fla. 2021) (also holding that one of the Plaintiffs in this case had standing based on the Eleventh Circuit's *ACE* decision).

In short, Mercury invited and led the district court into error, persuading it to rely on a single decision (*New York Central*) that relied solely on another single decision (*USAA*) whose author has since explained that it does not support the proposition Mercury advocates. However, even if authority existed to support

---

[9] At least eight additional decisions reach the same conclusion, but for the sake of brevity are not cited here.

48

Mercury's position, the question whether MSPRC or its designated series has standing to sue is a matter of contract or statutory law and subject to a Rule 17(a) real-party-in-interest challenge. *It is not a question that implicates Article III standing. E.g., Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016); Fed. R. Civ. P. 17 (providing that "[n]o action shall be dismissed" until after a reasonable time to substitute the real party in interest).

Since the district court identified no other "ownership" or other concerns for the remaining examples, a Rule 15(d) supplemental complaint would cure any standing issues.

### 2. *Plaintiffs Showed They Have Ownership Rights With Respect To HFHP Injuries*

With regard to the Settlement Action, the order on appeal also erroneously concluded that Plaintiffs did not own the A.P. non-reimbursement claim that was assigned by HFHP. The district court even accused Plaintiffs of misrepresenting the (true) fact that they have an assignment from HFHP.

Although the original HFHP assignment that Plaintiffs produced was from the wrong HFHP entity, both the Seventh and Eleventh Circuits have found Plaintiffs' reliance on that original assignment to be in good faith, because the "corporate arrangement [between HFAP and HFHA] was not just complex, but . . . freighted with overlapping names and functions." *ACE,* 974 F.3d at 1317; *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 585 (7th

49

Cir. 2019). Plaintiffs corrected the HFHP assignment through a *nunc pro tunc* assignment, which the Eleventh Circuit held, in *MSPRC v. QBE Holdings, Inc.*, 965 F.3d 1210, 1220 (11th Cir. 2020), "created a valid assignment of claims in this action."

Here, Plaintiffs attached to their standing brief the corrected assignment chain that was validated by the Eleventh Circuit. That assignment chain reflects the corrective measures Plaintiffs took since commencing this action in 2017, which establishes a valid assignment of the A.P. reimbursement claim that supports Plaintiffs' standing. As the Seventh and Eleventh Circuit decisions demonstrate, no basis existed for the order on appeal to accuse Plaintiffs of "misrepresenting" the (true) fact that they had an HFHP assignment.

### 3. *The D.M. Claim Conferred Standing for the Settlement Action*

The district court also rejected Plaintiffs' argument that the D.M. claim established standing for the Settlement Action, accepting Mercury's theory that Plaintiffs did not own a "legally protected interest." 1-ER-21. According to the district court's order, assignor Trinity did not have "recovery rights" to assign and "without recovery rights, Plaintiffs lack standing." *Id.* As with the HFHP assignment, the district court also accused Plaintiffs of misrepresenting their assignment rights with respect to Trinity—a conclusion that the court reached

50

without having given Plaintiffs a chance to respond to the argument and a conclusion that was based on the superficial view promoted by Mercury.

Plaintiffs understand that the district court might have been confused because Trinity was a physicians' group, not an MAO. However, such "downstream entities" that accept the "risk of loss" in contracting with an MAO acquire the MAO's reimbursement rights and may sue under the MSP Act to recover their own unreimbursed secondary payments. These downstream entities are typically doctor and provider groups that know their Medicare beneficiary patients the best and, as a result, are willing to contract with MAOs to take on the full financial risk for a defined group of Medicare beneficiaries. They effectively step into the MAO's shoes and become the MAO. *ACE*, 974 F.3d at 1316.

Plaintiffs also advised the district court that this issue is settled. In 2020, the Eleventh Circuit invited HHS to submit an amicus brief in the then-pending *ACE* appeal on the question whether downstream entities such as Trinity suffer an injury in fact from unreimbursed secondary payments. HHS, after acknowledging its significant interest in ensuring that the MSP Act is properly interpreted, unequivocally concluded that downstream entities that take on an MAO's risk of loss suffer the "same injury that the Medicare Advantage organization suffered in [*W. Heritage*, 832 F.3d at 1235]." 4-ER-606.

51

Plaintiffs provided the district court with the HHS *ACE* amicus brief and with evidence (8-ER-1424, 1503–68) demonstrating that assignor Trinity had contracted with Freedom Health (an MAO) and agreed to absorb Freedom's risk of loss for a pool of Medicare beneficiaries that included D.M. The risk of loss that Trinity agreed to accept is defined in the risk agreement as "Covered Services," which include the services that Freedom is statutorily required to provide as an MAO. 8-ER-1505.

In exchange for Trinity's accepting the financial risk for those covered services, Freedom transferred CMS' $50 per-member, per-month, capitation payment to Trinity, which is further described in Attachment D-1 to the risk agreement. 3-ER-233, 375–79. Trinity was then required to use that payment to provide for all "Covered Services" for particular Medicare beneficiaries, including D.M. *Id.*

As HHS confirmed, Freedom's transfer of risk to Trinity converted Trinity into the kind of entity that bears "the health care risk of the [MAO]" and thereby "suffer[s] injury if not reimbursed by the primary insurer . . . ." 4-ER-606. "This sort of harm plainly qualifies as Article III injury," and empowering risk-bearing entities to sue under MSP Act "advances the goals of the Medicare Secondary Payer statute," including protecting "the fiscal integrity of the Medicare program

by ensuring that Medicare will not be required to pay for items or services for which a primary plan should be responsible." 4-ER-607.

The Eleventh Circuit in *ACE* reached the same conclusion as HHS and held that downstream entities like Trinity may sue under the MSP Act private right of action. *See ACE*, 974 F.3d at 1316 ("[W]hen a downstream actor bears the cost of an MAO's conditional payments, that downstream actor suffers an injury squarely within the ambit of the Medicare Secondary Payer Act . . . . [I]n light of the text, purpose, and persuasive agency interpretation of § 1395y(b)(3)(A), we hold that downstream actors that have made conditional payments in an MAO's stead or that have reimbursed an MAO for its conditional payment can bring suit for double damages against the primary payer.").

Nonetheless, the district court, at Mercury's urging (and without the benefit of briefing by Plaintiffs), cherry picked language in the Trinity agreement with Freedom to reach the mind-boggling conclusion that Trinity had assumed all risk of paying for a group of Medicare beneficiaries' care—which would be secondary to any primary plan—but somehow also had agreed to assign back to Freedom its reimbursement rights under the MSP Act. This plainly made no sense, as no rational business would take on all risk but also disarm itself from suing for nonpayment. According to Mercury and the order on appeal, Freedom Health transferred to Trinity its duty to pay for enrollees' care, but somehow retained the

53

right to sue for reimbursement of secondary payments that Trinity ended up paying. Even if it were not absurdly incorrect, this tortured contractual construction could not support dismissing this action on standing grounds for two reasons.

*First*, Mercury's theory that a contractual provision divested Trinity of its MSP Act reimbursement rights is a merits-based argument, which this Court previously has held does not implicate standing: "Whether a plaintiff possesses legally enforceable rights under a contract is a question on the merits rather than a question of constitutional standing." *Lindsey v. Starwood Hotels & Resorts Worldwide Inc.*, 409 F. App'x 77, 78 (9th Cir. 2010). At a minimum, any analysis of the contract needed to await a decision on the merits.

*Second*, Trinity's MSP Act reimbursement right—which arises by statute— is an extra-contractual right that the risk agreement could not take away. As the Eleventh Circuit has held, "The MSP Act's private cause of action does not require any sort of relationship (contractual or otherwise) with the government (or anyone else) as a prerequisite to suit." *MSP Recovery LLC v. Allstate Ins. Co.*, 835 F.3d 1352, 1358 (11th Cir. 2016). Since standing to bring a claim under the MSP Act is *not* "derivative of" an MAO's "contractual relationship with Medicare," *id.*, neither can it be derivative a physician group's contractual relationship with an MAO.[10]

---

[10] *MAO-MSO Recovery II, LLC v. Mercury Gen.*, 2017 WL 5086293, at *3 (C.D. Cal. 2017) (MSP Act claims are not claims "on the MAO's contract with the

Thus, Trinity's right to recover for Mercury's failure to identify and reimburse Trinity's secondary payments has nothing to do with the risk agreement. Trinity had the statutory duty to provide the care and make conditional payments, which became secondary under the MSP Act because Mercury was the primary payer. Trinity has the right to reimbursement of its secondary payments.

The order on appeal would create nothing but mischief in this context. If one of Freedom's enrollees, for whom Trinity accepted the risk of loss, were involved in a car accident and required $20,000 in medical treatment, Trinity would have to ultimately pay that amount as a conditional payment under its contract with Freedom, but the same contract would prohibit Trinity from seeking reimbursement from Mercury, the primary payer. As for Freedom, it would have no injury and no Article III standing.

Not surprisingly, neither Mercury nor the district court cited any authority that would allow Medicare-related entities to effectively contract away the primary payer's obligation to reimburse the secondary payer. *See ACE*, 974 F.3d at 1314 (Such a result would impose costs on the downstream entity that the MSP Act sought to avoid being "permanently passed from an MAO to a downstream actor with no recourse.").

---

government, which merely permits [the MAO] to provide insurance plans that offer Medicare benefits.").

Trinity has the right under the MSP Act to seek reimbursement from Mercury of conditional payments it made for D.M.'s accident-related medical expenses, because it contractually assumed the MAO's responsibility for D.M.'s care, and Mercury is the primary payer. Mercury's failure to reimburse Trinity injured Trinity, not Freedom. This Court should conclude that Plaintiffs have standing based on Mercury's non-reimbursement of the D.M. secondary payments.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFFS LEAVE TO FILE AN AMENDED COMPLAINT

After repeated requests for leave to amend that the district court brushed aside, Plaintiffs filed a formal motion upon receiving the district court's dismissal order, because an amendment easily could address all issues needed for this litigation to proceed on the merits. The proposed amendment sought to: (1) correct a technical defect by adding the words "Series PMPI" after "LLC" to the Plaintiff MAO-MSO Recovery II, LLC; (2) add the additional assignments that occurred since 2017; (3) add examples of non-reimbursement claims identified from court-ordered data-matching discovery; and (4) remove extraneous assignment allegations that data matching revealed had no relevance to the case. *See* 2-ER-48; 2-ER-123.

The district court denied the motion because Plaintiffs purportedly "unduly delayed" and the request would "prejudice" Mercury. 1-ER-13–14. The district court's decision offends this Circuit's standards for motions to amend.

56

### A.  The District Court's Denial of Leave to Amend Did Not Comport With This Circuit's Liberal Interpretation of Rules 15(a) and (d)

Rule 15 expressly provides that a court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a). A party also may seek to supplement a pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," even if "the original pleading is defective in stating a claim or defense." Fed. R. Civ. P. 15(d).

This Court has instructed district courts to apply Rule 15(a) with "extreme liberality," recognizing the principle that controversies should be decided on the merits and not on mere technicalities. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("Rule 15(a) is very liberal and leave to amend shall be freely given when justice so requires.") (cleaned up); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) ("[T]he underlying purpose of Rule 15 [is] to facilitate decision on the merits, rather than on the pleadings or technicalities.") (cleaned up). Leave should be denied only where the amendment: "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen*, 465 F.3d at 951; *accord Foman v. Davis*, 371 U.S. 178, 182 (1962).

This Court's liberal policy of permitting amendments to resolve disputes on the merits is well-illustrated by *Northstar*, which addressed Rule 15(d). *See* 779 F.3d at 1046. There, the Court considered whether a plaintiff could cure a lack of

standing by alleging an event that occurred after the original complaint was filed. Defendants there argued that "because standing must be determined at the time a complaint is filed," an assignment executed several months after the original complaint was filed could not cure plaintiff's lack of standing. *Id.*

Upon *de novo* review, this Court rejected that argument, holding that Rule 15(d) "permits a supplemental pleading to correct a defective complaint and circumvents *the needless formality and expense of instituting a new action* when events occurring after the original filing indicated a right to relief." *Northstar*, 779 F.3d at 1044 (cleaned up) (emphasis added). The Court held that policy considerations could not justify an inflexible rule that would require a plaintiff to "file a new complaint instead of a supplemental pleading because of a post-complaint assignment from a party that had standing." *Id.* at 1047.

Here, the district court "elevate[d] form over substance," *Northstar*, 779 F.3d at 1044, when it denied Plaintiffs leave to amend to cure the purported standing issues through amendment and supplementation. This is especially obvious where the order made no finding of futility. Instead, leave to amend was denied solely based on purported undue delay and prejudice to Mercury.

## B. There Is No Undue Delay, Because Plaintiffs Actively Sought to Assert Their Right to Amend

It is well-established in this Circuit that delay alone is insufficient to deny leave to amend. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir.

58

1987). Further, in considering whether there was "undue delay," this Circuit does not require formal motions for leave to amend. *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1446 (9th Cir. 1990) (The lack of a formal motion to amend "did not preclude the district court from granting leave to amend."); *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013) ("[T]the absence of a formal motion for leave to amend does not preclude the district court from granting it.").

Here, the district court's finding of undue delay cannot be reconciled with its instruction in December 2020 that Plaintiffs should wait until class certification to seek amendment, 4-ER-642, let alone Plaintiffs' request six months later in their standing brief for leave to amend pursuant to Rules 15(a) and 15(d), 3-ER-452 —a request that Mercury opposed, 3-ER-427–28. Finally, Plaintiffs filed a motion for leave to amend a month after the dismissal order and two weeks after they filed their reconsideration motion. 1-ER-13.

The district court's conclusion that "[p]laintiffs fail to provide any explanation or reasoning for this delay in filing," 1-ER-13, is also inconsistent with its own order. Earlier in the order, the court emphasized: "Plaintiffs admit that their argument seeking that the Court consider their request for leave to amend, is simply a repetition of *their prior argument asserted in their briefing regarding*

*standing.*" 1-ER-11 (emphasis added). The record demonstrates that Plaintiffs were not dilatory in seeking leave to amend.

### C. There is No Prejudice to Mercury from Granting Leave to Amend Where the District Court Dismissed the Actions Without Prejudice

The lack of prejudice to the opposing party "carries the greatest weight" in determining whether to grant leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 185 (9th Cir. 1987)). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Id.* Amended complaints that simply conform to the evidence, clarify and allege assignments, and correct the name of a plaintiff, can cause no prejudice at all, let alone undue prejudice.

The district court denied plaintiffs' leave to amend on the notion that amendment would prejudice Mercury, "since it would essentially have to restart the entire litigation and defend itself based on a new set of operative facts . . . ." 1-ER-14. The irony of this assertion is that the dismissal—not leave to amend—is what would "restart the entire litigation." In this case, substantial discovery and motion practice, including significant discovery motions, already have occurred. Following an amendment of the complaint, the case would simply pick up where it left off at the point that the standing issue arose.

60

In contrast, because the case was dismissed without prejudice, Plaintiffs would be required to file the proposed amended complaint as a new action and then, literally, start over again, from scratch. Mercury undoubtedly would file new motions to dismiss and discovery would resume, especially if the case were assigned to a different judge and magistrate judge.

This plainly would undermine judicial efficiency because of (a) the loss of the district court's and magistrate judge's knowledge and familiarity with the issues in these actions, and (b) Mercury's potential ability to side-step the magistrate judge's data-matching order and relitigate other orders. Whether the parties would have to redo extensive discovery already completed would depend on Mercury's willingness to cooperate—an uncertain proposition given that Mercury stalled discovery here by arguing that evidence revealed by data matching during settlement discussions was subject to the mediation privilege. D.E. 379.

These real-world, procedural realities beg the question—not considered below—whether allowing amendment of the complaint would cause such substantial prejudice as to outweigh the prejudice that would result from requiring the parties to start all over again. This case would become "Exhibit A" for the Court's repeated admonition that controversies should be decided on the merits and not on technicalities. *See Edwards*, 892 F.2d at 1445; *Northstar*, 779 F.3d at 1044. Judicial economy is best served by allowing amendment, and Mercury will suffer

zero prejudice, because it cannot avoid continued litigation that involves the same facts, law, and claims.

Moreover, denying leave to amend also would further delay Plaintiffs' recovery of secondary payments that Mercury undeniably owes. Thus, allowing Plaintiffs to amend also will further Congress' mandate that primary payers be compelled to repay conditional payments and not continue shifting responsibility for medical expenses to the Medicare system.

## CONCLUSION

For all the foregoing, good and sufficient reasons, plaintiffs respectfully request that the Court reverse the order on appeal, reinstate the cases, and permit amendment of the operative complaints.

Dated: May 16, 2022

/s/ Andrés Rivero

Andrés Rivero, Esq., FBN 613819
Alan H. Rolnick, Esq., FBN 715085
arivero@riveromestre.com
arolnick@riveromestre.com
**RIVERO MESTRE LLP**
2525 Ponce de Leon Blvd. Suite 1000
Miami, FL 33134
Tel: (305) 445-2500 / Fax: (305) 445-2505

Martha A. Geer
Mark Silvey
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
(919) 600-5000

*Counsel for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrés Rivero, hereby certify that, on May 16, 2022, I electronically filed the foregoing with the Clerk for the United States Ninth Circuit Court of Appeals using the CM/ECF system, which shall send electronic notification to counsel of record.

/s/ Andrés Rivero
Andrés Rivero